UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No. 3:21-CR-64 JD

(2) ALBERT SMITH

**OPINION AND ORDER**

The defendant, Albert Smith, was convicted at a jury trial of ten counts[1] relating to a conspiracy he and his co-conspirators orchestrated to defraud the Housing Authority of South Bend. Following Mr. Smith's conviction, the Probation Office prepared a Presentence Investigation Report ("PSR") to aid the Court in sentencing. Mr. Smith has filed several objections to the PSR. (DE 393, 396.) The briefing on the objections is complete and they are ripe for adjudication. For the following reasons the Court will sustain in part and deny in part the objections.

**A. Background**

The Court has previously described the circumstances of this case in greater detail, but will provide an overview. Mr. Smith was formerly a management official at the Housing Authority of South Bend ("HASB") with a series of titles. While there is some dispute about what his precise final title at the HASB was — whether it was "Asset Director" or "Asset Manager" or "Asset Manager Director" — there is no dispute over his duties. These included managing the public housing program under Executive Director Tonya Robinson, overseeing

---

[1] One count (Count 1) of conspiracy to commit bank and wire fraud in violation of 18 U.S.C. § 1349, six counts (Counts 2–7) of bank fraud in violation of 18 U.S.C. § 1349, two counts (Counts 8 and 9) of wire fraud in violation of 18 U.S.C. § 1343, and one count (Count 10) of federal program theft in violation of 18 U.S.C. § 666(a)(1)(A).

renovation and maintenance work done on residential units, seeking and receiving bids for maintenance work from outside contractors, receiving invoices for work done on units, and preparing payment checks for contractors. Further, it is undisputed that in his role Mr. Smith answered directly to Ms. Robinson and was described by witnesses at trial to be her deputy.

Over the course of several years Mr. Smith conspired with Ms. Robinson and others to operate a "hub and spoke" fraud scheme using their official authority. HASB relied on both internal maintenance employees and independent contractors to maintain the public housing properties it owned. Ms. Robinson and Mr. Smith, the hub, would issue fraudulent payments to co-conspirator maintenance contractors, the spokes, and the contractors would then return a portion of those checks in cash to the hub. The payments were fraudulent as they were issued for work which was not actually performed. The four contractor co-conspirators were Archie Robinson III, Ronald Taylor, Doug Donley, and Latassia Burger.[2] Tonya Robinson's daughter, Tyreisha Robinson, was in a relationship with Doug Donley during this time and also participated in the conspiracy. Tyreisha Robinson collected and cashed some of the checks made out to Mr. Donley. Apart from co-conspirator Doug Donley, all the contractors also performed some legitimate work for the HASB. As part of this scheme Ms. Robinson and Mr. Smith fabricated false HASB documents, including invoices, to make it appear as though the stolen money was being appropriately spent on maintenance.

### B. Discussion

The Court will address each of Mr. Smith's objections in turn.

---

[2] A few points of clarification are helpful: Archie Robinson is unrelated to Tonya Robinson, Latassia Burger is an unindicted co-conspirator, and except for Doug Donley all the contractors testified at trial as Government witnesses. Tyreisha Robinson also testified on behalf of the Government.

### (1) Offense Conduct Objections (Paragraphs 10 and 14)

Mr. Smith has two objections related to the offense conduct described in Paragraphs 10 and 14. The first is that the PSR incorrectly describes his job title (Paragraph 10).[3] The second is that it incorrectly describes his date of departure from the HASB (Paragraph 14).

Mr. Smith's first objection is that the PSR incorrectly describes his ultimate job title in the HASB as "Asset Director" (DE 392 ¶ 10) when his title was allegedly "Asset Manager Director." Mr. Smith indicates he held that title from September 2016 until his departure and previously held the titles of Interim Asset Manager from June to September 2016, and Finance Support Specialist from February 2015 to June 2016. Mr. Smith argues that because the PSR, and Superseding Indictment, allege he committed criminal acts as "Asset Director" and not "Asset Manager Director," then the loss amount should not be assessed against him. In short, because of a minor alleged error in describing his job title he should be freed from culpability for his crimes.

This argument will be denied for several reasons. First, Mr. Smith has provided no legal authority supporting his bold proposition that what amounts to a scrivener's error in the Superseding Indictment and PSR is a basis to invalidate the jury's verdict. Second, Mr. Smith has not disputed he held the substantive role described in the PSR or that its description of his job duties was incorrect. As the Government correctly notes, the nature of Mr. Smith's precise job title is not relevant to the fact the jury found him guilty of the charged offenses based on his conduct and his role in the HASB. Third, Mr. Smith does not offer any evidence the PSR is

---

[3] The objection filed by Mr. Smith's counsel identifies Paragraph 14 as containing the error about his job title. This is incorrect as Paragraph 10 is the one which contains his formal job title. Paragraph 14 does not refer to Mr. Smith's formal job title at all.

incorrect in stating his job title besides his naked assertion. The Government's response to the objection notes that Mr. Smith himself told FBI agents interviewing him on July 31, 2019, that his position was "Asset Director", and Ms. Robinson told the same thing to FBI agents during her interview on that date. Moreover, former HASB employees Joanne Watford and Tim Pruitt both referred to Mr. Smith's formal title as "Asset Director" during their testimony at trial. (DE 330 at 45:9 (Watford), 72:17–73:8 (Pruitt).)

Mr. Smith's second objection is that the PSR incorrectly describes his date of departure from the HASB. The PSR indicates Mr. Smith departed around the end of March 2019. Mr. Smith argues that he departed by January 14, 2019, to begin a position with the City of South Bend. Mr. Smith correspondingly argues he should not be held liable for any loss amount incurred by the conspiracy after January 14, 2019.

The Government responds that Mr. Smith may have continued working part time at the HASB and even if he formally stopped working there, he continued to participate in the conspiracy through March. The Government notes that contractors Ronald Taylor and Latassia Burger testified that when it came to cashing HASB checks and delivering kickbacks, they exclusively dealt with Mr. Smith. (DE 330 at 206:10–23 (Taylor testimony); DE 331 at 48:16–49:20 (Burger testimony).) Ms. Burger's last check from HASB was dated March 11, 2019, with four other checks being issued to her from January 14 through February. (Gov't Exh. 29 at 3.) Ms. Burger testified at trial that she delivered a portion of each HASB payment check she received to Mr. Smith in cash. (DE 331 at 48:14–49:10). Mr. Taylor's last two checks from the HASB were dated April 8, 2019. (Gov't Exh. 28 at 3.) Further, two paychecks issued to Doug Donley were dated February 25 and March 7, 2019, and were endorsed by Tyreisha Robinson

who testified that cash from those checks would've been brought back to Mr. Smith. (Gov't Exh. 30 (summary of checks); DE 331 at 94:3–23.)

The Court finds this constitutes sufficient evidence in the record to support the conclusion Mr. Smith remained involved in the conspiracy through the end of March 2019. Regardless of whether Mr. Smith still held his formal title of Asset Director between January and March 2019, the evidence shows he was involved in the conspiracy by collecting payments from contractors. The reasonable loss estimate for Mr. Smith should accordingly extend through March 2019, and the Court will overrule this objection.

The Court accordingly overrules the objections to Paragraphs 10 and 14.

### (2) Loss Amount (Paragraphs 35 and 49)

Mr. Smith objects to the loss amount proposed in the PSR; for the reasons below that objection will be sustained in part.

Section 2B1.1(b)(1) of the Sentencing Guidelines provides that if the loss from an offense involving fraud or deceit exceeds $6,500, then there will be an increase to the offense level calculation based on the amount of loss. U.S.S.G. § 2B1.1(b)(1). The appropriate increase is reflected in a corresponding table. *Id.* The Government bears the burden, under the preponderance of the evidence standard, to establish a loss amount. *United States v. Hogge*, No. 2:07-cr-46, 2011 WL 1158442, at *4 (N.D. Ind. Mar. 29, 2011) (citing *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000)). The commentary to the Guidelines outlines two ways in which loss can be calculated; "actual loss" and "intended loss." Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) n.3(A)(i). Intended loss "(I) means the pecuniary harm that the defendant purposely sought to

inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1(b)(1) n.3(A)(ii). Both parties here propose actual loss amounts tied to the amount of money which was actually paid to the contractors for work not performed.

The Court is only obligated to make a "reasonable estimate" of the financial loss based upon the available evidence. U.S.S.G. § 2B1.1 n.3(C).[4] However, determining whether or not a loss was reasonably foreseeable requires the Court to perform causation analysis and conclude the defendant was both the but for and proximate cause. *United States v. Domnenko*, 763 F.3d 768, 777 (7th Cir. 2014) (determining whether a loss was reasonably foreseeable requires causation analysis); *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) (the causation analysis includes but for and proximate causation inquiries). Furthermore, the reasonable estimate must be based on reliable and specific evidence. *Hogge*, 2011 WL 1158442, at *8; *see also United States v. White*, 639 F.3d 331, 339 (7th Cir. 2011) (while the Federal Rules of Evidence do not apply at sentencing hearings, the district court must ensure evidence used is reasonably reliable).

The PSR proposes a loss amount of $3,881,256,.87. (DE 392 ¶ 36.) This amount reflects one hundred percent of the cash withdrawn by co-conspirators Ronald Taylor and Latassia Burger on the same day they deposited a paycheck from the HASB. It includes one hundred percent of the cash withdrawn by Archie Robinson III through the end of March 2019, but excludes any amounts after that point when the conspiracy continued solely between him and

---

[4] The Guidelines commentary also provides a list of factors a court should consider in making its estimate. Id. at n.3(C)(i)–(vi). However, none of these factors are applicable to the circumstances of this case.

Ms. Robinson. It also includes one hundred percent of the HASB payments to co-conspirator Doug Donley. This proposed loss amount results in an increase of eighteen offense levels as it is a loss amount greater than $3,500,000 but less than $9,500,000. U.S.S.G. § 2B1.1(b)(1)(J). The Government acknowledges that while most of the contractors performed some legitimate work for the HASB, there are no clear records or witness recollections of how their total proceeds from the HASB were divided; i.e., how much was for legitimate work actually performed.  In total, there was $6,894,190.87 in HASB checks issued to Archie Robinson, Ronald Taylor, Latassia Burger, and Doug Donley. The Government suggests that all of the cash withdrawals made on days a contractor deposited an HASB check is a reasonable approximation of the amount taken by fraud. This is because the contractors testified, they would withdraw cash from the deposit of a bogus paycheck on the same day as the deposit and then return that cash as a kickback to Ms. Robinson or Mr. Smith. The Government's method also counts one hundred percent of the HASB payments made to Doug Donley based on the fact he never performed any legitimate work for the HASB.

Mr. Smith raises a series of arguments to this loss amount. The first is that this amount should exclude any payments made after January 2019, when Mr. Smith left the Housing Authority. This argument can be rejected out of hand as the Court has already found Mr. Smith remained involved in the conspiracy through the end of March 2019.

The second, third, and fourth arguments raised by Mr. Smith all dispute the reasonableness of the Government's loss calculation methodology and propose an alternative loss calculation similar to what Tonya Robinson proffered in her objections to the PSR. For the

same reasons the Court adopted her proposed methodology in its ruling on her PSR objections, the Court will adopt that methodology here. (DE 399).[5]

Mr. Smith suggests an alternative loss amount of $2,944,120. This alternative loss amount would result in an increase of sixteen levels as it is greater than $1,500,000 but less than $3,500,000. U.S.S.G. § 2B1.1(b)(1)(I). Mr. Smith argues this number is more appropriate as it accounts for the co-conspirators' testimony at trial that they received more money from legitimate work than from fraud and they used some of their cash withdrawals to cover legitimate operating expenses. In Mr. Smith's view this means that a majority of the HASB money received by the contractors, including the cash withdrawn on the same day that a check was deposited, should be presumed to be legitimate. Mr. Smith thus proposes that after considering all the money paid to the contractors, again $6,894,190.87, something less than half of this amount should be designated as the loss. Mr. Smith proposes the ratio should be sixty-forty, with forty percent of the total compensation to Archie Robinson, Ronald Taylor, and Latassia Burger from the HASB being considered loss. Mr. Smith concedes the entire amount of HASB money paid to Doug Donley should be considered loss as he did not perform any legitimate work for the HASB.

For the reasons more thoroughly detailed in the Court's order regarding Ms. Robinson's objections, the Court will sustain the objection and adopt the proposed alternative methodology for the loss amounts related to Mr. Robinson and Mr. Taylor. (DE 399 at 5–7.) The Court finds this alternative methodology is the most reasonable assessment of the trial record and best reflects the contractors' testimony that they received more compensation from HASB for work performed than work not performed. The objection will be overruled as it relates to Ms. Burger

---

[5] The Court incorporates by reference its prior order on Ms. Robinson's PSR objections.

because her testimony offered greater detail, indicating that if cash was withdrawn on the same day as a deposit, then it was exclusively used to pay the kickback. (*Id.* at 7.)

The fifth argument is that the kickback received by Mr. Smith from Ms. Burger, in part reflects legitimately earned compensation for helping Ms. Burger administer her business affairs. As a reminder, Mr. Smith recruited Ms. Burger to perform work for the Housing Authority. Ms. Burger did not prepare her own invoices or keep track of her business' finances and left those affairs to Mr. Smith. Mr. Smith also rebuffed her whenever she tried to gain more information about her business affairs. In short, Mr. Smith would like to keep the "honest wages" he earned performing bookkeeping for Ms. Burger's business while using it as a front to extract money from the HASB for work which was not actually performed. The Court will deny this request. There is no evidence in the record distinguishing between what percent of time, if any, Mr. Smith spent processing legitimate paperwork for Ms. Burger versus what time was spent preparing phony invoices to enrich himself. *See also United States v. Moreno-Padilla*, 602 F.3d 802, 809 (7th Cir. 2010) (holding that the defendant bears the burden of showing facts contained in the PSR are inaccurate, including the burden of producing some evidence that calls the reliability or correctness of the alleged facts into question).

Under these circumstances, and because Mr. Smith recruited her into the conspiracy with the intention of using her as a straw man for extracting money from the Housing Authority, it is a reasonable presumption that his efforts were confined to perpetuating his fraud. The Government has shown that Ms. Burger's payments to Mr. Smith were illegal kickbacks as part of the conspiracy to defraud the Housing Authority. If Mr. Smith believes he is legitimately entitled to a portion of those payments for services rendered as a bookkeeper, then the onus is on him to provide evidence of such work and distinguish it from his fraudulent activities.

In light of these rulings, the final loss amount will be calculated as follows. Mr. Robinson collected a total of $2,777,182.53 in HASB checks through the end of March 2019. (Gov't Exh. 27 at 5.) Forty percent of this amount is $1,110,873. Mr. Taylor collected a total of $1,915,817.50. (Gov't Exh. 28.) Forty percent of this amount is $766,327. These numbers are then added with the total same day cash withdrawals of Ms. Burger, $849,820, and the total amount of HASB funds paid to Mr. Donley, $303,920.[6] This results in a total loss amount of $3,030,940, slightly higher than that proposed by Mr. Smith, but still an increase of sixteen offense levels. U.S.S.G. § 2B1.1(b)(1)(I). Again, this methodology is identical to that used in calculating the loss amount for Tonya Robinson's sentencing.[7]

### (3) Sophisticated Means Enhancement (Paragraphs 36 and 50)

Next, the Court turns to Mr. Smith's objection to paragraphs 36 and 50 of the PSR. These paragraphs apply a two-level enhancement based on Mr. Smith utilizing sophisticated means during his fraud.

The relevant provisions of the Guidelines states that if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels." U.S.S.G. § 2B1.1(b)(10)(C). The commentary to the Sentencing Guidelines describes sophisticated means as:

> "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main

---

[6] This amount is in accord with the Court's ruling on Mr. Donley's objections to his PSR. (DE 380 at 6.)

[7] Ms. Robinson also received a sixteen-level enhancement but had a slightly different loss amount given her presence throughout the entire conspiracy, whereas Mr. Smith was not involved after March 2019. (DE 399 at 7.)

office of the scheme in one jurisdiction but locating soliciting operations in another

jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or

transactions, or both, through the use of fictitious entities, corporate shells, or offshore

financial accounts also ordinarily indicates sophisticated means."

U.S.S.G. § 2B1.1 n. 9.

The Seventh Circuit has instructed that this enhancement is properly applied "when the

conduct shows a greater level of planning or concealment than a typical fraud of its kind."

*United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011) (internal quotations and citations

omitted). The Seventh Circuit has also stated that the enhancement is proper when "the offense

conduct, viewed as a whole, was notably more intricate than that of the garden-variety

[offense]." *United States v. Knox*, 624 F.3d 865, 870–71 (7th Cir. 2010) (quoting *United States v.

Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009)). Further, the Seventh Circuit has held that Section

2B1.1(b)(10)(C)'s use of the phrase "intentionally engaged in or caused the conduct constituting

sophisticated means" clarifies that this enhancement should be based on the individual

defendant's conduct rather than on the basis of the sophistication of the overall scheme alone.

*United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023) (internal citations omitted).

Mr. Smith argues this enhancement is inapplicable because his conduct, which he limits

to "submitting fake invoices," is "about as basic as this kind of fraud gets." (DE 393 at 5.) Mr.

Smith also argues he did not create any fictitious entities or otherwise commit any of the acts

described in the Guidelines' commentary and this is a "simple case of lying to a government

agency to get grant money." (*Id.*)

The Government disagrees, arguing that Mr. Smith created a false business, D Fresh

Contracting, and this is a classic example of sophisticated means. The Government also argues

that the variety and volume of falsified documents prepared by Mr. Smith during the long running fraud constitutes sophisticated means.

The objection will be overruled. The record evidence establishes that Mr. Smith participated in the creation of a fictitious business enterprise, D Fresh Contracting, which was used as a part of the conspiracy. This fact alone merits the enhancement. U.S.S.G. § 2B1.1 n. 9. It is undisputed that, unlike every other contractor co-conspirator, Douglas Donley's business "D Fresh" never performed any legitimate work for the Housing Authority. In fact, the business never performed any contracting work at all and existed solely as a shell entity to collect payments from the HASB and enrich the coconspirators. During her testimony Tyreisha Robinson explained that while she and Mr. Donley were owners of the business, she personally never performed any work for the business and never observed Mr. Donley perform any work. (DE 331 at 107:7–15.) Further, during the lifespan of the business from the Fall of 2017 until March 2019, Mr. Donley was mainly living and working in Atlanta with only periodic returns to South Bend. (*Id.* at 96:10–97:15.) All of this establishes that D Fresh was never a real business and its true purpose was to advance the fraud scheme.

There is also strong evidence in the record that Mr. Smith was directly involved in the creation of the business and using it to advance the conspiracy. Tyreisha Robinson testified that in the Fall of 2017, Mr. Smith spoke with her about a business proposition. Namely that he wanted to know if Doug Donley wanted to start a business. (*Id.* at 97:24–98:5.) Tyreisha Robinson provided Mr. Smith with Mr. Donley's phone number and, not long after that conversation, Mr. Smith then approached Tyreisha with the first HASB check made out to Doug Donley. (*Id.* at 98:6–10.) As with the other co-conspirators, this began a series of transactions where Mr. Smith would inform Tyreisha when he had a check for her and Mr. Donley to collect

and instructed them on how much cash to bring back to him. (*Id.* at 102:5–18.) Tyreisha also testified that during the lifetime of the business she never prepared any invoices for the company, never observed Mr. Donley prepare any such invoices, and did not know who prepared the D Fresh invoices recovered from HASB records. (*Id.* at 110:5–12.) This supports the inference that Mr. Smith was producing these false invoices and using the fictitious business entity to disguise some of the conspiracy's activity. As a result, the enhancement is appropriately applied to Mr. Smith. *United States v. Allan*, 512 F.3d 712, 716 (7th Cir. 2008) (finding that the use of fictitious business entities supports a finding of sophisticated means).

Mr. Smith's role in the creation of Tea's Maintenance, Ms. Burger's business, and his management of its affairs also supports the enhancement. While Tea's Maintenance cannot be considered a wholly fictitious company, given it did perform legitimate maintenance work, it exists because Mr. Smith recruited Ms. Burger to begin performing work for the Housing Authority. He then exercised unparalleled control over the business' bookkeeping, going as far as to deny Ms. Burger information about what money her own business was owed by the HASB. Thus, while distinct from D Fresh, Tea's Maintenance can be considered a straw man enterprise. This is because Tea's Maintenance was created at the instigation of Mr. Smith for his benefit, advancing his fraud instead of for the benefit of its owner. This fact supports application of the enhancement. *See United States v. Anobah*, 734 F.3d 733, 739 (7th Cir. 2013) (finding use of *straw purchasers*, false loan applications, and false documents supported the enhancement).

The enhancement is also supported by the variety and large volume of falsified business documents over the course of the conspiracy. It is important to make a distinction here between Mr. Smith and Tonya Robinson, who raised a similar objection to the sophisticated means enhancement which the Court sustained. The relevant distinction is that the record only

established that Ms. Robinson created *some* false invoices, while it supports the conclusion Mr. Smith created a variety, and large volume, of false documents in furtherance of this scheme. Seventh Circuit precedent holds that individual, unsophisticated, actions can collectively amount to a scheme which is considered sophisticated means. *See, e.g., United States v. Redman*, 887 F.3d 789, 792–93 (7th Cir. 2018) (affirming application of sophisticated means enhancement where defendant "caused the creation of a substantial amount of paperwork, including fake diplomas, fake resumes, and fake unauthorized licenses and made government filings in order to further and conceal his elaborate scheme.")

Mr. Smith's cumulative actions regarding false documents are not quite as complex as those in *Redman*, but still support the application of the enhancement when considered in conjunction with the other factors already discussed. The Court would note three aggravating factors related to false documents. First, Mr. Smith's extensive involvement in creating false documents for multiple contractors suggests a desire to conceal the theft by spreading false payments among multiple co-conspirators. Second, the fact Mr. Smith prepared multiple types of fraudulent documents to create an appearance that not only was the HASB paying solely for legitimate work, but that it had a competitive bidding process. Third, the sheer volume of false documents Mr. Smith created over the course of his involvement in the conspiracy.

There is extensive evidence that Mr. Smith created false invoices for the various contractors in the conspiracy and sometimes was the only one creating business records for a contractor. As mentioned previously, Tyreisha Robinson testified that neither she nor Mr. Donley ever created invoices for their shell contracting business despite receiving payments from the HASB. Archie Robinson testified that as a part of the conspiracy he personally created some false invoices, in Microsoft Word, for the HASB at the direction of Mr. Smith. (DE 330 at

169:11–170:1.) He would then submit those false invoices to Mr. Smith in exchange for payment. (*Id.* at 170:2–7.) Mr. Robinson further testified that at a certain point he began to receive payments for false invoices which he did not personally prepare, and which were prepared by Mr. Smith using Mr. Robinson's prior invoices as a template. (*Id.* at 170:23–171:4.) Latassia Burger testified that she never prepared any business records herself and that Mr. Smith handled those affairs for her. (DE 331 at 52:9–53:25.)

This extensive involvement in creating falsified documents for multiple contractors supports applying the sophisticated means enhancement.[8] This is because it suggests Mr. Smith worked to conceal the scope of the fraud by dispersing relatively smaller illegitimate payments among multiple contractors rather than directing a considerable amount of payments to one single contractor, as the latter might draw more attention from auditors or oversight authorities. This distribution structure is analogous to the practice of "structuring" currency transactions, breaking larger transfers into a series of smaller transactions, to avoid bank reporting requirements and thereby make the illicit flow of funds harder to detect. The Seventh Circuit has previously held that structuring transactions constitutes sophisticated means. *See United States v. Ghaddar*, 678 F.3d 600, 603 (7th Cir. 2012) (explaining the practice of "structuring" and upholding application of sophisticated means enhancement based on defendant structuring currency transactions).

Mr. Smith also created falsified quotes from contractors to create the impression that the HASB had a competitive bidding process instead of Mr. Smith directing falsified payments to preselected contractors. The documents from Government's Exhibit 37 relating to maintenance

---

[8] This is also distinct from his co-defendant Tonya Robinson, who is only directly implicated in creating some falsified invoices for Archie Robinson after Mr. Smith had left the Housing Authority.

for the unit at 2110 Warren illustrate this effort. There are quotes, all at similar prices, for the requested work from KTR, Taylor Made Handyman, and Tea's Maintenance. (Exh. 37 at 9–11.) There is also an invoice reflecting the work was awarded to Tea's Maintenance. (*Id.* at 8.) All three entities providing quotes are co-conspirator contractors.

As noted previously, Latassia Burger testified she never prepared any invoices or quotes for the HASB and Mr. Smith did that work for her. Her testimony is clear evidence that the quotes here, and every other Tea's Maintenance quote, were prepared by Mr. Smith to create a paper trail that supports the illusion of competitive bidding. The fact the quote and invoice for work performed have the same date on them is further evidence that fraud motivated the creation of these documents. (Exh. 37 at 8–9.) FBI Special Agent Paul Allen testified at trial that quotes were made before it was even known which contractor would perform the work while invoices were generally completed only once the job was finished. (DE 336 at 250:22–251:3.) Consequently, the fact the documents had the same date supports the inference that they were being created at the same time to establish a false paper trail.

Such obfuscation of the trail of money through a falsified bidding process is indicative of sophisticated means. It is analogous to a component of the scheme in *United States v. Knox*. 642 F.3d 865 (7th Cir. 2010). In *Knox* the defendant tricked mortgage lenders into financing properties at prices exceeding the real property value by falsifying prospective buyers' loan applications with misinformation about the source of the down payment and providing grossly inflated appraisals. *Id.* at 871. Here, the Housing Authority stands in for the mortgage lenders in the sense it was approving maintenance contracts after considering falsified quotes from multiple contractors. These falsified quotes putatively suggest a fair market rate for the described work, just as the falsified appraisals in *Knox* suggested the fair market value of the home to be

mortgaged. The Court recognizes that unlike *Knox*, the HASB's approval was never really in doubt given the two HASB employees directly overseeing the contracting process, Mr. Smith and Ms. Robinson, were co-conspirators. Further, the dating of the falsified quotes – often using the same date as the invoices submitted for work completed – suggests they were fabricated as an afterthought. Nonetheless, the falsified quotes provided a plausible narrative for scrutinizing eyes, such as the HASB Board of Commissioners or HUD[9] auditors, to help conceal the conspiracy.

The large volume of falsified records created is also a factor which weighs in favor of the enhancement, demonstrating the magnitude of the effort to conduct and secrete the conspiracy. Again, this scheme ran for four years and stole millions of dollars from the HASB in increments which were usually less than $20,000 per fraud. (*See* Gov't Exhs. 27–30 (summaries of check payable to contractors).) This scheme consequently required hundreds of transactions[10] and false document to succeed. This considerable effort reflects efforts which go beyond "typical fraud of this kind" and merits the enhancement. *See e.g.*, *United States v. Roy*, 748 Fed.Appx. 712, 716 (8th Cir. 2018) (unpublished) (affirming the application of sophisticated means enhancement to a defendant who over the course of five years "submitted fraudulent documents in support of at least ten bids for projects in several locations across the State of Minnesota and did business under multiple company names.")

Thus, the record establishes that Mr. Smith's conduct rises to the level of sophisticated means and the enhancement is appropriately applied.

---

[9] U.S. Department of Housing and Urban Development

[10] Government Exhibit 31, a summary table of Exhibits 27 through 30, indicates a total of 512 checks were issued to the four contractors during the period when the conspiracy was active. Almost all of these checks were partially or fully cashed out on the day of deposit.

### (4) Position of Public or Private Trust Enhancement (Paragraphs 37 and 52)

Mr. Smith's next objection is to Paragraphs 37 and 52 of the PSR. These paragraphs apply a two-level enhancement for his abuse of a position of public or private trust in commission of the offense. U.S.S.G. § 3B1.3. The commentary to the Sentencing Guidelines defines a position of public or private trust as follows:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors."

U.S.S.G. § 3B1.3 n. 1.

Mr. Smith raises five objections to the application of this enhancement. The first four can be grouped together as they collectively argue that Mr. Smith lacked sufficient professional or managerial discretion in his role as Asset Director to qualify for the enhancement. He notes that

he was a subordinate employee to Ms. Robinson, the Executive Director, and as her subordinate he was obligated to follow her instructions, he had no discretion in his work, and he did not directly report to the Housing Authority's Board of Commissioners.[11] These arguments are manifestly unpersuasive.

First, the mere fact a defendant has a supervisor and has prescribed job duties does not mean he cannot be considered to occupy a position of private or public trust. The question is whether the defendant has professional or managerial discretion in their role, not whether they are at the top of their organizational hierarchy. The Seventh Circuit has expressly held that individuals may hold a position of trust "even when they do not occupy upper-level or even supervisory positions." *United States v. Bradshaw*, 670 F.3d 768, 770 (7th Cir. 2012) (quoting *United States v. Cruz*, 317 F.3d 763, 767 (7th Cir. 2003)).

This leads into the second reason the argument fails, Mr. Smith was both an upper-level executive and supervisor at the HASB. Mr. Smith was characterized as the deputy to Ms. Robinson by HASB employees who testified at trial. (DE 330 at 45:4–19 (testimony of Joanna Watford).) In his role at the HASB he was responsible for overseeing the public housing program of over 800 units in the South Bend area. (DE 392 ¶¶ 9–10.) Kathryn Lamberg, the Executive Director who succeeded Tonya Robinson, testified that Mr. Smith's responsibilities as Asset Director[12] included managing and supervising the property managers and assistant property

---

[11] The Board of Commissioners is the seven-member body which makes general policy decisions and directs and supervises the work of the Housing Authority. The members are appointed by the Mayor of South Bend. The Board is not involved in the day-to-day management of the Authority as that duty is left to the Executive Director and her staff.

[12] Ms. Lamberg describes Mr. Smith's role as "director of asset management." (DE 327 at 115:8.) As noted previously, the specific formulation of Mr. Smith's official title while at the HASB is not a meaningful issue. Regardless of the formulation the evidence at trial is consistent among witnesses as to his duties and his position in the HASB hierarchy.

managers at the four different "AMPs" (Asset Managed Properties) within the Housing

Authority.[13] (DE 327 at 115:6–8.) The Asset Director would also be responsible for management

and maintenance of all properties owned by the Housing Authority and oversee renovation and

maintenance work done on those properties. (*Id.* at 115:13–116:1.) The Asset Director also had

authority to hire outside contractors to perform maintenance work and was responsible for

ensuring all maintenance work performed in each AMP was in accord with the HASB budget.

(*Id.* at 116:2–9.)

   Ms. Lamberg's testimony is bolstered by employees who served directly under Mr.

Smith. Joanne Watford, a former HASB Property Manager, testified that Mr. Smith was

responsible for overseeing all Property Managers (DE 330 at 45:9–46:4) and that maintenance

contractors would submit their invoices to either Mr. Smith or Ms. Robinson for approval (*Id.* at

48:25–49:2). Her testimony was corroborated by another former HASB Property Manager, Tim

Pruitt, who testified that his direct supervisor was Albert Smith (*Id.* at 72:15–73:11) and that Mr.

Smith was the person in charge of all property managers (*Id.* at 88:4–7).

   Maintenance contractors were paid using public monies and Mr. Smith had sufficient

authority and discretion in the organization that he was allowed to go into the HASB office on a

weekend and print out payment checks for contractors. The former HASB bookkeeper, Elizabeth

Chilafoe, testified that Mr. Smith admitted to her he would sometimes come into the office on

Saturdays and print checks for maintenance contractors himself even though it was generally her

responsibility. (DE 330 at 24:13–18.) Ms. Chilafoe also testified that Ms. Robinson was aware

---

[13] AMP stands for Asset Managed Property. (DE 327 at 113:19–20.) Each AMP is a grouping of Housing Authority Properties managed by a Property Manager, who functions as a landlord to the properties, and his or her assistant. (*Id.* at 114:11–22.) The HASB had four AMPs at the times relevant to this case.

those checks had been prepared, which indicates Mr. Smith was acting within his authority. (*Id.* at 25:10–14.)

Mr. Smith used his public position to facilitate the commission of the offense. In his role he was responsible for overseeing and approving the work performed by outside contractors which made him well positioned to approve the phony invoices he had prepared for his co-conspirators. The Seventh Circuit has expressly approved of using this enhancement when the defendant had the ability to approve their own false invoices. *Bradshaw*, 670 F.3d at 770 (noting the defendant had unrestricted access to the corporate vice president's email account and could therefore approve her own false invoices).[14]

Mr. Smith's other objection is that "this was a simple case of lying to the HUD to get funds." (DE 393 at 8.) While it is not perfectly clear what Mr. Smith is arguing with this point, the Court construes it as arguing that Mr. Smith is trying to analogize himself to the "ordinary bank teller or hotel clerk" described in Application Note 1 to § 3B1.3. For the reasons described above, that analogy simply does not fit. Mr. Smith was not a mere employee, he was considered the second in command of the Housing Authority, he exercised supervisory powers over the public housing program's staff, he had the discretion to hire outside maintenance contractors, and he had autonomy to use the HASB offices outside normal business hours to prepare contractor payment checks. All of these factors persuade the Court that he had sufficient managerial discretion, and abused it in the course of this offense, to merit the abuse of trust enhancement.

---

[14] The Court would further note that while the Circuit described *Bradshaw* as "close to the outer boundaries of the abuse-of-trust enhancement", Mr. Smith is less of a close call. 670 F.3d at 771. Unlike Ms. Bradshaw, who was an executive assistant with a high degree of trust and informal responsibility, Mr. Smith was a supervisor and had formal authority. *Id.* at 769, 771.

As such, the objection to Paragraphs 37 and 52 is overruled.

### (5) Organizer or Leader Enhancement (Paragraphs 38 and 53)

Next, Mr. Smith objects to Paragraphs 38 and 53 of the PSR. These paragraphs apply a four-level enhancement for his role as an organizer or leader of criminal activity involving five or more participants. U.S.S.G. § 3B1.1(a). The commentary to the Sentencing Guidelines provides a non-exhaustive list of factors the Court should consider in determining whether a participant is an organizer or leader:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1 n.4.

The Seventh Circuit has elaborated on this enhancement, instructing lower courts to consider the factors provided in the Guidelines but recognizing the "primary goal in applying § 3B1.1 should be to make a 'commonsense judgment about the defendant's relative culpability given [the defendant's] status in the criminal hierarchy.'" *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018) (quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015)). For purposes of this enhancement, a defendant "exercises control and authority over another when

[the defendant] 'tells people what to do and determines whether they've done it.'" *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013) (quoting *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012)).

Mr. Smith argues this enhancement is not supported by the record for two reasons.[15] First, Mr. Smith argues Ms. Robinson was more culpable as a leader than he was. Second, the fact Ms. Robinson and Archie Robinson continued the conspiracy after Mr. Smith left the HASB shows he was "simply not that important to the conspiracy." (DE 393 at 8.)

Mr. Smith's first argument, that another leader was more culpable, is simply without merit. The text of the provision indicates that it should be applied if the defendant "was *an* organizer or leader", not only if they were *the* organizer or leader. U.S.S.G. § 3B1.1. Application Note Four to this provision expressly refutes such an interpretation: "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.* at n.4. Whether Ms. Robinson was an organizer or leader is not, by itself, particularly relevant to determining whether Mr. Smith was an organizer or leader.

Mr. Smith's second argument will similarly fail. The conclusory assertion that Mr. Smith was "not that important" to the conspiracy because it continued for several months after he departed the HASB sidesteps the analysis offered by the Sentencing Guidelines. Not to mention it sidesteps the fact the conspiracy ran for several years with Mr. Smith as a key player and organizer.

---

[15] Mr. Smith does not dispute that the conspiracy contained at least five or more participants between himself, Tonya Robinson, and contractors Archie Robinson, Ronald Taylor, Douglas Donley, and Latassia Burger.

Independent of Mr. Smith's objections, the Court finds ample evidence in the record to support applying the enhancement. To begin, Mr. Smith was the principal recruiter of co-conspirators. The trial testimony of the contractors indicates that Mr. Smith was involved in recruiting them to the conspiracy. For example, Mr. Robinson testified that his involvement in the conspiracy began in 2014 or 2015 with Mr. Smith approaching him at a baseball game to discuss the possibility of making extra money. (DE 330 at 168:9–169:8.) Ms. Burger also testified that Mr. Smith recruited her to the conspiracy when he brought her a Mother's Day gift and suggested to her the possibility of making money by working for the Housing Authority. (DE 331 at 44:11–45:9.) Tyresiha Robinson testified that Mr. Smith approached her in order to contact Douglas Donley and to invite him to the scheme. (DE 331 at 97: 24–98:10.) Mr. Taylor testified he was approached by both Ms. Robinson and Mr. Smith who invited him to meet with them at the HASB headquarters building. (DE 330 at 209:4–15.) Mr. Smith's active role in recruiting new co-conspirators supports applying the enhancement.

Next, the contractors testified that Mr. Smith was their principal point of contact in the conspiracy. That is, the contractors testified Mr. Smith would issue them instructions to collect their illegitimate paychecks and they would return the kickback money to Mr. Smith. (DE 330 at 159:8–15 (Archie Robinson testimony), 209:12–210:20 (Ronald Taylor testimony); DE 331 at 48:20–49:11 (Latassia Burger testimony), 98:8–22 (Tyreisha Robinson testimony).) This indicates Mr. Smith was highly involved in the offense, playing a crucial role in organizing the conspiracy and was responsible for day-to-day operations. This also indicates Mr. Smith had control over the "spoke" co-conspirators as he was issuing them instructions about when to collect illegitimate checks

24

and where to bring him the kickbacks. Both of these factors also support applying the enhancement to Mr. Smith.

Consequently, the Court finds that the enhancement is appropriately applied and will overrule the objection.

### (6) Adjustment for Obstruction of Justice (Paragraphs 39, 43, 44, and 54)

Mr. Smith's final objection is to application of a two-level increase to his offense level for obstructing or impeding the administration of justice.

The relevant provision of the Guidelines states:

"If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."

U.S.S.G. § 3C1.1.

The Application Notes to this provision provides a non-exhaustive list of several examples of what conduct constitutes obstruction of justice. This list includes "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 n.4(G).

The PSR applies this enhancement as the trial record indicated that Mr. Smith instructed Ms. Burger to lie to investigating officers about how her business operated, claiming she prepared her own invoices (DE 331 at 64:14–15), and about her work at the Housing Authority, claiming she obtained work from Steve Peterson and not Mr. Smith (*Id.* at 61:14–18). These lies

minimized or excised Mr. Smith's involvement with Ms. Burger's business. Mr. Smith issued

this instruction after law enforcement had searched the HASB headquarters and interviewed

several defendants, including Mr. Smith, as part of the search. Mr. Smith objects to this

enhancement as he flatly denies telling Ms. Burger to lie or otherwise obstruct justice. This

denial is contradicted by the trial record where Ms. Burger testified that she had given differing

accounts of her knowledge of the conspiracy to law enforcement. (*Id.* at 56:21–57:1.) Ms. Burger

testified these variations were the result of Mr. Smith's instructions. Ultimately, she decided she

could not maintain the fiction and opted to tell the truth. (*Id.* at 57:3–10.)

Mr. Smith has offered no argument on why Ms. Burger's testimony is not credible, nor

proffered any evidence which would contradict her account. Nor has he disputed that the conduct

of instructing a witness to lie qualifies as obstruction of justice. *United States v. Fiore*, 178 F.3d

917, 925 (7th Cir. 1999) (affirming the application of the enhancement where the defendant

instructed a witness to lie to federal agents). As a result, the Court finds that the enhancement is

appropriately applied and will overrule the objection.

### C. Conclusion

Accordingly, the objections to the PSR are sustained in part and overruled in part. The

objection to paragraphs 10 and 14 regarding offense conduct is overruled. The objection to

paragraphs 35 and 49 regarding loss amount is sustained in part. The objection to paragraphs 36

and 50 regarding sophisticated means is overruled. The objection to paragraphs 37 and 52

regarding a position of public or private trust is overruled. The objection to paragraphs 38 and 53

regarding leadership or organizer status is overruled. The objection to paragraphs 39, 42, 44, and

54 regarding the obstruction of justice adjustment is overruled. The final offense level is 33.

SO ORDERED.

ENTERED: May 22, 2024

                      /s/ JON E. DEGUILIO

               Judge
United States District Court